# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

John Bellocchio,                                    Case No.: <u>19-CV-11240</u>

        Plaintiff,

v.                                                              **COMPLAINT**

Holy See (State of Vatican City; The Vatican),

        Defendant.

Plaintiff, for his cause of action against Defendant, alleges the following:

## <u>NATURE OF THE ACTION</u>

1.      Plaintiff John Bellocchio ("Plaintiff" or "Bellocchio") brings this lawsuit against Defendant the Holy See as a result of being sexually abused as a child in approximately 1995 or 1996 by former Cardinal Archbishop Theodore E. McCarrick ("McCarrick") while McCarrick was the Archbishop of the Archdiocese of Newark, New Jersey.  Before he was defrocked in 2018, McCarrick was a prominent Catholic official who served as a bishop, archbishop, and cardinal in the United States despite a history of sexual misconduct, including with minors.

2.      Bellocchio was sexually abused by McCarrick in approximately 1995 or 1996, approximately 7 years after another individual stated that he reported his own abuse as a minor by McCarrick to Supreme Pontiff John Paul II and Defendant Holy See in approximately 1988. Despite this report, McCarrick continued to be promoted within the ranks of Catholic hierarchy and Defendant Holy See took no action to remove McCarrick from working with minors and as a result, Bellocchio was sexually abused.

## <u>PARTIES</u>

3.      Plaintiff John Bellocchio is an adult male resident of the State of New Jersey.

Plaintiff was a minor resident of the State of New Jersey and a citizen of the United States at the time of the sexual abuse alleged herein. Plaintiff brings this action both in his individual capacity and on behalf of the general public. Plaintiff has also commenced a separate lawsuit against The Roman Catholic Archdiocese of Newark a/k/a Archdiocese of Newark and Theodore E. McCarrick, et al., in the Superior Court of New Jersey, Essex County based on some of the same incidents alleged herein.

4.     At all times material, Defendant Holy See (State of Vatican City; The Vatican) is a foreign country. The terms "Holy See," the "Vatican," and the "State of Vatican City" are used interchangeably throughout this Complaint and all refer to Defendant Holy See.

## JURISDICTION AND VENUE

5.     Plaintiff brings this complaint under federal diversity jurisdiction, 28 U.S.C. §1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

6.     This Court has both personal and subject matter jurisdiction over all matters in this action with respect to 28 U.S.C. §1330, as a claim for relief with respect to a foreign state not entitled to immunity under §§ 1604-1607.

7.     This Court has personal jurisdiction over Defendant Holy See because Defendant Holy See has engaged and continues to engage in commercial activity in New York and throughout the United States and territories.

8.     Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred within this District, and Defendant is subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

9.      At all times material, former Cardinal Theodore E. McCarrick ("McCarrick") was a Roman Catholic priest, cardinal, counselor and teacher educated by and under the direct supervision, authority, employ and control of Defendant Holy See and the Supreme Pontiff (also known as the "Pope").

10.      Defendant Holy See is the sovereign nation located in the Vatican City State, Italy and the ecclesiastical, governmental, and administrative capital of the Roman Catholic Church and seat of the Supreme Pontiff.  Defendant Holy See is the composite of the authority, jurisdiction, and sovereignty vested in the Supreme Pontiff and his delegated advisors and/or agents to direct the activities and business of the worldwide Roman Catholic Church.  Defendant Holy See has unqualified power over the Catholic Church including each and every individual and section of the church including, but not limited to, all priests, bishops, archbishops, metropolitans, cardinals, and all other church workers, as well as dioceses, archdioceses, ecclesiastical provinces, and orders.

11.      Defendant Holy See directs, supervises, supports, promotes and engages in the oversight of the sovereign nation, the organization, and its employees for the purpose of the business, foreign affairs, and employees of the worldwide Roman Catholic Church, and provides religious and pastoral guidance, education and counseling to Roman Catholics worldwide in exchange for all or a portion of the revenues collected from its members.

12.      Defendant Holy See engages in some of its activities and business through its agents, cardinals, bishops and clergy, including religious order priests, brothers and sisters, and lay employees who work under its authority.

13.      Defendant Holy See actively engages in commercial activity in the United States

by collecting contributions from members. Moreover, Plaintiff's claims are based in part on McCarrick's commercial employment relationship with Defendant Holy See and its agents. The relevant employment relationship is not peculiar to a sovereign as the employment is not part of civil service, the diplomatic corps, or the military. Nor was McCarrick privy to governmental policy deliberations or engaged in legislative work.

14.     Defendant Holy See also actively engages in commercial and business activity in the United States by recruiting and soliciting people to become members and contribute to the financial operation of the Roman Catholic Church, including overseeing the Society for the Propagation of the Faith in every diocese, including in the Archdiocese of New York (hereinafter "ADNY").

15.     Defendant Holy See is a unique entity, with an organizational structure and chain of command that mandates that Defendant Holy See and its head of state, the Supreme Pontiff, have a significantly high level of involvement in the routine and day-to-day activities of its agents and instrumentalities, particularly with respect to the handling of clergy who have engaged in certain specified conduct, including child sex abuse.

16.     Defendant Holy See enters into treaties and conventions with other foreign states including, but not limited to, the Universal Declaration of Human Rights, the Convention on the Rights of the Child and the Convention against Torture; maintains diplomatic relations with other foreign states, including the United States; and has observer status in the United Nations. Defendant Holy See occupies its own sovereign territory located within the city of Rome.

17.     Defendant Holy See, engages in commercial and business activity in the State of New York, the United States and throughout the world.

18.     As part of its fundraising activities, Defendant Holy See oversees a pontifical

mission society, the Pontifical Society for the Propagation of the Faith.  The Society for the Propagation of the Faith was founded in 1822 and has a central office in Rome under the oversight and control of Defendant Holy See.  Through offerings in New York, the United States, and worldwide, "[u]nder the direction of the Congregation for the Evangelization of Peoples (Rome, Italy) and the bishops, the Society for the Propagation of the Faith seek to foster an ever-deeper spirit of universal mission, to inform Catholics of the life and the needs of the Catholic Church in the Missions, and to encourage prayer and financial help for those mission churches." (https://propagationarchny.org/society-for-the-propagation-of-the-faith; last visited December 6, 2019).

19.     Each diocese has a separate Society for the Propagation of the Faith under the control and oversight of Defendant Holy See, including the ADNY.  Money donated to the Society for the Propagation of the Faith is sent to the Pontifical Mission Societies in the United States which is headquartered in New York and which is also under the direction and control of Defendant Holy See.  The Society for the Propagation of Faith takes donations and has special collections specifically for the mission.

20.     Defendant Holy See's business or private operation, in addition to overseeing its employees not engaged in work peculiar to a sovereign, performs acts that are commercial in nature, including extensive financial operations and fundraising activities throughout the United States.  Consistent with its corporate structure, Defendant Holy See has instituted worldwide, mandatory policies that perpetuate its financial strength and stability, particularly through the Society for the Propagation of the Faith.

21.     Defendant Holy See also operates the Permanent Observer Mission of the Holy See to the United Nations which is headquartered in ADNY.  As part of this Mission, the Holy See

5

maintains a "Holy See Permanent Observer Mission Fund" in New York "to support the ongoing work of the Permanent Observer Mission of the Holy See to the United Nations in New York." (https://osvonlinegiving.com/4399/DirectDonate/55512; last visited December 7, 2019.)

22.     Also as part of its fundraising activities, Defendant Holy See has continued the long and entrenched tradition of Peter's Pence.  Peter's Pence fundraising for Defendant Holy See has been active since 1871 when it was created by the "Saepe Venerabilis" encyclical authored by Supreme Pontiff Pius IX.  Members are encouraged to send their donations throughout the year directly to the Office of the Holy Father in Vatican City, but Defendant Holy See also directs and coordinates an international campaign each and every year on June 29 or the closest Sunday to the Solemnity of Saints Peter and Paul for its subdivisions, agencies, and/or instrumentalities to take up   a   specific   collection   for   the   benefit   of   Defendant   Holy   See. (http://www.vatican.va/roman_curia/secretariat_state/obolo_spietro/documents/index_en.htm last visited December 6, 2019.)

23.     Peter's Pence raises funds that are required to be sent directly to Defendant Holy See.  Dioceses, bishops, archbishops and other agents are ordered to send the funds directly to "His Holiness Supreme Pontiff Francis, 00120, Vatican City."   As part of Peter's Pence, Defendant Holy See is involved in the United States in creating materials to advertise for its campaign and benefits directly from solicitation letters sent to members of its organization throughout the United States.  It is also directly involved in and authorizes and supports appeals at parishes throughout the United States for members to give money to Defendant Holy See and the creation and distribution of materials to help its agents recruit funds for the Peter's Pence Collection.  Defendant Holy See also uses other forms of media such as ads and posters to solicit funds in the United States.

24.     On information and belief, the Peter's Pence operation has provided Defendant Holy See with millions of dollars each year from the United States.  The Peter's Pence collection brought in almost $80 million for Defendant Holy See in 2007 and over $100 million in 2006, with the United States providing the largest percentage of the funds.  Defendant Holy See's business divisions in the United States facilitate the largest portion of money collected for Defendant Holy See in the Peter's Pence Collection.

25.     As part of this campaign, Defendant Holy See and its agents recruit and solicit people to become paying members of the organization.

26.     Defendant Holy See also assesses each bishop, archbishop, and cardinal a tax for certain activities.  This is money that is required to be sent to Defendant Holy See.

27.     Defendant Holy See also assesses a monetary amount that each diocese, archdiocese, bishop, archbishop and cardinal must pay annually to Defendant Holy See.  Generally this amounts to thousands of dollars from each Diocese.

28.     As part of its business and private operation, Defendant Holy See requires its agents in charge of its operation in a particular geographical location to come to Rome and report about the state of Defendant Holy See's operations, including any problems involving issues that are commercial in nature, including financial status and business issues.  Defendant Holy See calls these Ad Limina visits.  These agents, as appointed leaders of the local business and private operations including those in the United States, are required to make this visit at least once every five years.  As part of its business and private operation, Defendant Holy See also requires its divisions to write detailed reports about the status of the operation including, but not limited to, personnel issues, finances, and real estate holdings.  With respect to the income of pastors and their supervisors, Defendant Holy See requires information regarding whether it is from real estate,

public funds, or from a contribution made by the faithful or by the diocese.  These reports are sometimes called "quinquennial reports."

29.     Defendant Holy See has direct involvement with seminaries in the United States including New York, where it trains agents in its organization and operation.  On August 15, 1990, Supreme Pontiff John Paul II issued an apostolic constitution on Catholic higher education entitled Ex corde Ecclesiae.  The Apostolic Constitution described, in detail, the top-down relationship between Defendant Holy See and its educational institutions like seminaries.  According to the Catholic Church Extension Society, no matter where it is located or how it is structured, every institution within the organization answers to Defendant Holy See.  Defendant Holy See's Congregation for Catholic Education has jurisdiction over all Catholic institutions of higher learning, including seminaries.  As a result, it oversees and controls the admissions requirements and curricula to ensure that candidates are properly prepared.  In addition, since 1971, U.S. seminaries have adhered to the Program of Priestly Formation (PPF) promulgated by the U.S. bishops' conference and also approved by Rome.  Defendant Holy See has a vast enterprise in the United States which recruits and solicits members in order to support its business operations in the United States and worldwide.

30.     Defendant Holy See is solely responsible for creating new divisions of its business and private enterprise (called a "diocese" or "archdiocese") around the world.  Only Defendant Holy See has this power.  Defendant Holy See created all of the dioceses in New York, including the ADNY.  It creates, divides and re-aligns dioceses, archdioceses and ecclesiastical provinces. It also gives final approval to the creation, division or suppression of provinces of religious orders and it is solely responsible for modification or elimination of one of the divisions of its business enterprise.

31.     Defendant Holy See reserves the exclusive right to perform numerous local activities within its business operation within the United States including, but not limited to, overseeing and managing the Society for the Propagation of the Faith, laicization of clerics, dispensations from its rules and regulations, and appeals of a bishop's decision.

32.     Defendant Holy See has control over and involvement with property owned by all Catholic entities in New York.  Defendant Holy See's permission is required for the alienation (sale, gift, etc.) of much of the property owned by Catholic Entities in New York.

33.     Defendant Holy See directly and definitively controls the standards, morals, and obligations of the clergy of the Catholic Church.  Defendant Holy See also does this by and through its agents and instrumentalities, including the Congregation for the Clergy and the Congregation for Religious, both delegated by the Supreme Pontiff and acting on his behalf and under his authority.  Defendant Holy See interacts with its local business units including those in the United States in a manner that controls their day-to-day business and provides for no discretion on numerous issues, and in particular the handling of child sex abuse by clergy and the determinations whether clergy remain in Defendant Holy See's employ.   Defendant Holy See routinely promulgates its policies through various means including encyclical, canon law, and Papal pronouncements.

34.     Defendant Holy See controls where its agents live and prohibits certain conduct. At times, Defendant Holy See has prohibited clerics from gambling, carrying arms, hunting, or spending time at a tavern without just cause.  Defendant Holy See has also prohibited clerics from practicing medicine or surgery, from being a legislator, or volunteer for the army.

35.     Defendant Holy See promotes the sacred liturgy, directs and coordinates the spreading of its doctrine, and undertakes other actions necessary to promote its doctrine.  It creates,

appoints, assigns and re-assigns cardinals, bishops, superiors of religious orders, and through the bishops and superiors of religious orders has the power to directly assign. Defendant Holy See has the final and sole power to remove individual clergy. All cardinals, bishops, clergy, and priests, including religious order priests, vow to show respect and obedience to the Supreme Pontiff and the bishop of their diocese or head of their religious order.

36.     Defendant Holy See also examines and is responsible for the work and discipline and all those things which concern bishops, cardinals, superiors of religious orders, priests and deacons of the religious clergy. In furtherance of this duty, Defendant Holy See requires bishops to file a report, on a regular basis, outlining the status of and any problems with clergy. Defendant Holy See promulgates and enforces the laws and regulations regarding the education, training and standards of conduct and discipline for its members and those who serve in the governmental, administrative, judicial, educational and pastoral workings of the Catholic Church worldwide. Defendant Holy See is also directly and solely responsible for removing superiors of religious orders, bishops, archbishops and cardinals from service in the various divisions and offices of the Catholic Church.

37.     Defendant Holy See buys and sells real and personal property, and purchases and supplies goods and services in pursuit of its private and business activities.

38.     Defendant Holy See--even beyond its collection through Peter's Pence and other means--is supported through the contributions of its parishioners, which are received as part of a regular course of commercial conduct in the form of donations of money, real property and personal property.

39.     A major source of funds for Defendant Holy See is monies received from its parishioners in the form of tithing. The amount of money flowing to the Defendant from the

United States is directly affected by the beliefs of its parishioners in the righteousness of Defendant Holy See and its conduct. As members of the Church, they are obligated to revere, respect, and obey the edicts issued from Defendant Holy See, and are under threat of a denial of the sacraments or excommunication if they do not follow those edicts.

40.     Another major source of funding that Defendant Holy See and its agents receive is in the form of tuition for attendance at its Catholic schools.

41.     Defendant Holy See directs and mandates the morals and standards of conduct of all clergy of the Roman Catholic Church. Defendant Holy See ostensibly does this by and through its agents and instrumentalities, by enforcement of its rules and regulations written and promulgated by Defendant Holy See and used as the employee manual for clergy.

42.     Defendant Holy See creates, appoints, assigns, reassigns and retires all clerics, bishops, archbishops and cardinals. It accords definitive approval to the election of the heads of religious orders and, through the religious superiors and the bishops of dioceses, it exercises the power to directly assign and remove individual priests and deacons. It also determines whether religious orders are to be disciplined for inappropriate behavior and whether they may remain in the Church following inappropriate behavior.

43.     All cardinals, bishops, priests and clergy, including religious order priests, vow to show respect and obedience to Defendant Holy See. For example, when a priest is ordained, he kneels before his bishop and promises him and his successor's obedience and respect. On the day a priest receives the fullness of the priesthood in his ordination to the episcopacy, he stands before his consecrators and the assembled people of God and promises his obedience and loyalty to the supreme Roman pontiff, Defendant Holy See. He receives financial support throughout the full length of his life, and he may not be deprived of his pension or his clerical status unless Defendant

Holy See approves.

44.     Each cardinal takes an oath upon becoming a cardinal which requires obedience to Defendant Holy See and also requires secrecy in certain circumstances.  An English translation of that oath is "I [name and surname], Cardinal of the Holy Roman Church, promise and swear to be faithful henceforth and forever, while I live, to Christ and his Gospel, being constantly obedient to the Holy Roman Apostolic Church, to Blessed Peter in the person of the Supreme Pontiff [name of current Pontiff], and of his canonically elected Successors; to maintain communion with the Catholic Church always, in word and deed; not to reveal to anyone what is confided to me in secret, nor to divulge what may bring harm or dishonor to Holy Church; to carry out with great diligence and faithfulness those tasks to which I am called by my service to the Church, in accord with the norms of the law."

45.     Defendant Holy See examines and is responsible for the work and discipline and all those things which concern cardinals, bishops, superiors of religious orders, priests and deacons.  In furtherance of this duty, Defendant Holy See, among other things, requires bishops to file a report, on a regular basis, outlining the status of and any problems with priests and clergy.

46.     Defendant Holy See promulgates and enforces the laws and regulations regarding the education, training and standards of conduct and discipline for those who serve in the governmental, administrative, judicial, educational and pastoral workings of the Roman Catholic Church worldwide.

47.     No priest, cleric, superior of a religious order, bishop, archbishop or cardinal may be removed from service without the approval of Defendant Holy See; nor can any priest, cleric, superior of a religious order, bishop, archbishop or cardinal remain in service over the objection of Defendant Holy See.

48.     Defendant Holy See is directly and absolutely responsible for removing bishops, archbishops and cardinals from service in the various divisions and offices of the Roman Catholic Church by issuing instructions, mandates and dictates in the United States.

49.     The problem of child sexual abuse committed by Roman Catholic clerics and others within Defendant Holy See's control is almost as old as the Roman Catholic Church itself.  The first formal legislation was passed at the Council of Elvira in Spain in 306 A.D.  This council passed legislation condemning sexual abuse by the clergy, including sexual abuse of boys.  The Council of Elvira was the first in a series of legislative attempts by the Church to curb its problem of child sexual abuse committed by its clergy.

50.     In the 11th century, a writing authored by Father Peter Damien, THE BOOK OF GOMORRAH, was presented to Defendant Holy See.  This work encouraged punishment of priests and clerics who sexually molested and abused children, particularly boys.

51.     In 1917, Defendant Holy See codified all of its rules, regulations and laws, including those applicable to its employees, agents, and instrumentalities in one document.  These rules and regulations specifically forbade priests and clerics from having sexual relations or relationships with children under the age of 16, demonstrating that Defendant Holy See was well aware of the centuries-old practice of child sexual abuse by Roman Catholic priests and clerics. Today, in the current 1983 version, the sexual abuse of children by priests and clerics continues to be expressly forbidden.

52.     The rules and regulations are mandatory and must be obeyed by each member of Defendant Holy See, including by all dioceses, archdioceses, bishops, archbishops, cardinals, and priests.

53.     Defendant Holy See has known about the widespread problem of child sexual abuse

13

committed by its clergy for centuries, but has covered up that abuse and thereby perpetuated the abuse. Secret settlement agreements with victims have been used to silence the victims and their families and to protect the abuser from criminal prosecution by United States and state authorities. This practice was designed to shield Defendant Holy See from "scandal," and has been mandated not only in the United States but throughout the world, including North and South America, Europe and Australia. Defendant Holy See is responsible for the historically verified practice of the hierarchy, including the bishops, moving sexually abusive priests to areas where allegations of the offender's abusive conduct were not known. Defendant Holy See has never taken appropriate or effective steps to remove sexually abusive priests from the ministry. The absolute power of Defendant Holy See over its bishops and clergy in the United States was demonstrated in 2002, when the most powerful American bishop's organization, the U.S. Conference of Catholic Bishops, adopted a proposed policy designed to protect children from priest sexual abuse. The bishops were powerless to implement this policy without approval from Defendant Holy See. Defendant Holy See denied approval of key provisions sought by the U.S. bishops which would have required that its agents in the United States report all known or suspected child abuse to the civil authorities. Defendant Holy See also refused to give the U.S. bishops the power to remove abusive priests from the ministry.

54.     While the "public" policy of Defendant Holy See is to forbid child sexual abuse by priests and clerics within its control, the actual "private" or secret policy is to harbor and protect its abusive priests, clerics, bishops, archbishops, cardinals, agents, and employees from public disclosure and prosecution, in order to maintain the Supreme Pontiff's rightful claim of control and thereby ensure that its parishioners, followers and financial contributors will keep confidence in the institution, continue to view Defendant Holy See and the Supreme Pontiff as deserving of

allegiance, and, therefore, continue to contribute money and property to Defendant Holy See.

55.     Defendant Holy See has mandated a multi-level policy of mandatory secrecy over all matters involving the administrative, legislative and judicial activities of the Vatican offices and departments under the direct authority of the Supreme Pontiff, as well as overall similar activity in dioceses throughout the world.  There are degrees of secrecy demanded of the bishops, cardinals, clergy, and members.  The highest level of secrecy is the absolute secrecy mandated for all communications which take place in the sacrament of penance, commonly referred to as "confession."  The highest level of secrecy outside the confessional is known as the "Pontifical secret," which is imposed on certain activities of the various departments or congregations of Defendant Holy See.  Violation of the Pontifical Secret results in certain severe penalties, including excommunication.

56.     At all times material hereto, and as part of both its course of commercial conduct and particular commercial transactions and acts, Defendant Holy See directed its bishops in the United States to conceal from its parishioners and the general public the sexual abuse of children committed by its priests, bishops, cardinals, clerics, agents and employees in order to avoid public scandal, and to perpetuate its Christian public image and power to ensure the continued receipt of funds from its parishioners and other financial contributors, all in furtherance of the Defendant Holy See's commercial activities.

57.     Plaintiff was sexually abused as a child by one of Defendant Holy See's clerics, agents or employees.  Defendant Holy See's directives to conceal the sexual abuse of children committed by its clerics, agents, and employees in order to maximize revenue and image by avoiding scandal was a substantial factor in bringing about Plaintiff's abuse.

58.     In 1990, Defendant Holy See ratified the Convention on the Rights of the Child

("CRC") and is therefore legally obligated to comply with it.

59.     By ratifying the CRC, Defendant Holy See agreed to be legally bound by the terms of the CRC.

60.     By ratifying the CRC, Defendant Holy See committed itself to implementing the Convention not only on the territory of the Vatican City State but also as the supreme power of the Catholic Church through individuals and institutions placed under its authority.

61.     In January 2014, Defendant Holy See was called to respond to questions about its record in protecting children from sexual violence.

62.     In February 2014, the CRC issued a report on Defendant Holy See's failure to protect children and expressed its deepest concern about child sexual abuse committed by members of the Catholic Churches who operate under the authority of Defendant Holy See, with clerics having been involved in the sexual abuse of tens of thousands of children worldwide.

63.     The United Nations has expressed the following concerns with Defendant Holy See's compliance with the CRC:

    a.     Defendant Holy See has consistently placed the preservation and reputation of the Church and the protection of perpetrators above the best interest of children;

    b.     That well-known child sexual abusers have been transferred from parish to parish or to other countries in an attempt to cover-up such crimes;

    c.     That despite establishing full jurisdiction over child sexual abuse cases in 1962 and placing them under the exclusive competence of the Congregation of the Doctrine of the Faith in 2001, Defendant Holy See has failed to provide the United Nations with data on all cases of child sexual abuse brought to its attention over the reporting period and the outcome of the internal procedure in these cases;

d.      That Defendant Holy See's internal law has addressed child sexual abuse through confidential proceedings which have allowed the vast majority of abusers and almost all those who concealed child sexual abuse to escape judicial proceedings in States where the abuses were committed;

e.      That Defendant Holy See's internal law imposes a code of silence on all members of the clergy which has (i) prevented child sexual abuse from being reported to law enforcement authorities; and (ii) caused those members who have reported to be ostracized, demoted or fired, while priests who have refused to denounce child abusers have been congratulated and promoted within the Catholic Church;

f.      Defendant Holy See has adopted policies and practices which have continued the abuses and impunity of perpetrators;

g.      Defendant Holy See has been reluctant or refused to cooperate with judicial authorities to the detriment of the safety of children;

h.      That limited efforts have been made to empower children enrolled in Catholic schools, and institutions to protect themselves from sexual abuse; and

i.      That Defendant Holy See has in some instances obstructed efforts in certain countries to extend the statute of limitations for child sexual abuse.

64.      The CRC made the following recommendations to Defendant Holy See, none of which Defendant Holy See has complied with:

a.      To independently investigate all cases of child sexual abuse and make the outcomes public to prevent the recurrence of child sexual abuse within the Catholic Church;

b.      Immediately remove all known and suspected child sexual abusers from

assignment and refer to relevant law enforcement authorities for investigation and prosecution;

     c.    Ensure a transparent sharing of all archives which can be used to hold abusers accountable as well as those who concealed their crimes and knowingly placed offenders in contact with children;

     d.    Amend their internal law for child sexual abuse to be considered a crime and repeal all provisions which may impose an obligation of silence on the victims and on those who become aware of their crimes;

     e.    Establish clear rules, mechanisms, and procedures for the mandatory reporting of all suspected cases of child sexual abuse and exploitation to law enforcement authorities;

     f.    Ensure that all priests working under the authority of Defendant Holy See are made aware of their reporting obligations and that in case of conflict, these obligations prevail over internal law provisions; and

     g.    Promote the reform of statute of limitations in countries where they impeded victims of child sexual abuse from seeking justice and redress.

65.    Defendant Holy See was instructed to respond to the CRC Committee's report by September 1, 2017, but failed to comply.

66.    In 2002, Defendant Holy See ratified the Convention against Torture ("CAT") and is therefore legally obligated to comply with it.

67.    By ratifying the CAT, Defendant Holy See agreed to be legally bound by the terms of the CAT.

68.    By ratifying the CAT, Defendant Holy See committed itself to implementing the

Convention not only on the territory of the Vatican City State but also as the supreme power of the Catholic Church through individuals and institutions placed under its authority.

69.     In May 2014, Defendant Holy See was reviewed for the first time by the CAT.

70.     Following the review, the CAT issued a report finding that the widespread sexual violence within the Catholic Church amounts to torture and cruel, inhuman and degrading treatment prohibited by CAT.

71.     The CAT expressed concern that Defendant Holy See did not provide requested data on the number of cases in which Defendant Holy See provided information to civil authorities in places where the cases arose and where the priests concerned are currently located, stating "the Committee is concerned by reports that the [Holy See's] officials resist the principle of mandatory reporting of such allegations to civil authorities."

72.     The CAT also expressed concern about the transfer of clergy accused or convicted by civil authorities to other dioceses and institutions where they remained in contact with minors and others who are vulnerable, and in some cases committed abuse in their subsequent placements.

73.     The CAT made the following recommendations to Defendant Holy See, none of which Defendant Holy See has complied with:

    a.     Ensure that individuals that are subject to an allegation of abuse brought to the attention of the Congregation for the Doctrine of the Faith or other officials of the State party are immediately suspended from their duties pending the investigation of the complaint, to guard against the possibility of subsequent abuse or intimidation of victims;

    b.     Ensure effective monitoring of the placements of all clergy that are under investigation by the Congregation for the Doctrine of the Faith and prevent the transfer of clergy who have been credibly accused of abuse for the purposes of avoiding proper

investigation and punishment of their crimes.  For those found responsible, apply sanctions, including dismissal from the clerical state;

c.      Ensure that all State party officials exercise due diligence and react properly to credible allegations of abuse, subjecting any official that fails to do so to meaningful sanctions;

d.      Take effective measures to ensure that allegations received by its officials concerning violations of the Convention are communicated to the proper civil authorities to facilitate their investigation and prosecution of alleged perpetrators;

e.      Establish an independent complaints mechanism to which victims of alleged violations of the Convention can confidentially report allegations of abuse and which has the power to cooperate with Defendant Holy See's authorities as well as civil authorities in the location where the alleged abuse occurred;

f.      Ensure that organizations charged with carrying out investigations into allegations of violations of the Convention by public officials of Defendant Holy See, including the Office of the Promotor of Justice, are independent with no hierarchical connection between the investigators and the alleged perpetrators;

g.      Take steps to ensure victims of sexual abuse committed by or with the acquiescence of Defendant Holy See's officials receive redress, including fair, adequate and enforceable right to compensation and as full rehabilitation as possible, regardless of whether perpetrators of such acts have been brought to justice.  Appropriate measures should be taken to ensure the physical and psychological recovery and social reintegration of the victims of abuse; and

h.      Compile statistical data relevant to the monitoring of the implementation of

the Convention, including data on complaints and investigations of cases amounting to violations of the Convention as well as on means of redress, including compensation and rehabilitation, provided to the victims.

74.      At all times material hereto, Defendant Holy See violated customary international law of human rights by ignoring, tolerating, disregarding, permitting, allowing, condoning and/or failing to report inhuman and degrading treatment such as the sexual abuse of minor children.  This conduct constitutes a violation of various human rights conventions, including the Universal Declaration of Human Rights and the Convention on the Rights of the Child, which the Defendant signed and ratified, and the Defendant's violation of customary international law and conventions was a substantial factor in bringing about the Plaintiff's injuries.

75.      At all times material hereto, Defendant Holy See breached duties owed to Plaintiff under customary international law of human rights, the federal common law, the law of the 50 states and territories, and the law of the State of New York, thereby causing injury to Plaintiff.

76.      At all times material hereto, Defendant Holy See's directives, which, among other things, prohibited the reporting of child sexual abuse to law enforcement authorities, constitute an act or acts of concealment or misleading or obstructive conduct under statutory law, common law, and customary international law.

77.      At all times material hereto, Defendant Holy See's concealment of its policy of harboring and protecting its abusive priests, clerics, bishops, archbishops, cardinals, agents and employees from public disclosure and prosecution constitutes an act or acts of concealment or misleading or obstructive conduct under statutory law, common law, and customary international law.

78.      Defendant Holy See has established exclusive policies and standards that dictate

how sexual abuse of children by its employees will be handled.  With respect to this aspect of its employment policy and business, Defendant Holy See mandates certain procedures and absolute secrecy by all involved on penalty of immediate removal from the organization (excommunication), retains the power at all times to conduct the inquisition of the case itself, and admits no deviations from its mandate.  Through its mandated policies and its agents and instrumentalities, Defendant Holy See is an integral part of the day-to-day handling of cases of child sex abuse by clergy.

79.     In 1922, Defendant Holy See released a confidential document regarding cases of solicitation of sex in the confessional.  This document mandated a specific procedure for Defendant Holy See's agents to use when a cleric abused children using the confessional.  The document required strict secrecy.

80.     The 1922 document showed that Defendant Holy See was fully aware that there was a systemic problem of its agents sexually molesting children using the confessional.

81.     In 1962, Defendant Holy See released the confidential document, Instruction on The Manner of Proceeding in Cases of Solicitation, (The Vatican Press, 1962), available at http://www.vatican.va/resources/resources_crimen-sollicitationis-1962_en.html   (last   viewed December 6, 2019) (hereinafter referred to as "Crimen Sollicitationis").  The heading of the document says "From the Supreme and Holy Congregation of the Holy Office To All Patriarchs, Archbishops, Bishops and Other Diocesan Ordinaries 'Even of the Oriental Rite'" and contains mandatory and specific instructions regarding the handling of child sex abuse by clergy.  It permits no discretion in the handling of such cases.  According to the document itself, it is an "instruction, ordering upon those to whom it pertains to keep and observe it in the minutest detail."  *Crimen Sollicitationis* at paragraph 24.

82.     The 1962 document again reinforced that Defendant Holy See had knowledge that there was a systemic problem of its agents sexually molesting children using the confessional.

83.     In Ireland, a government-generated, in-depth report that investigated and analyzed the sexual abuse of minors by clergy documented that the Catholic Church had a systemic problem of numerous clergy sexually abusing youth.  The report reached several conclusions including, but not limited to: cases of sexual abuse were managed within the institution with a view to minimizing the risk of public disclosure and consequent damage to the institution; the offenses were not reported to the police; the recidivist nature of sexual abuse was well known to authorities within the institution; the Church authorities knew that the sexually abusive clergy were often long-term offenders who repeatedly abused children wherever they were working; when confronted with evidence of sexual abuse, a standard response of the religious authorities was to transfer the offender to another location where, in many instances, he was free to abuse again; sexual abuse was endemic in boys' institutions.  http://www.childabusecommission.ie/ (last viewed December 6, 2019).  Defendant Holy See was an active manager and mandated the policies that led to these horrific occurrences in Ireland.

84.     Defendant Holy See has been involved in the formation of secret facilities in the United States where sexually offending clergy would be sent for short periods of time.  In 1962, Fr. Gerald Fitzgerald, working in the United States, was in communication with Defendant Holy See.  At the request of the prefect, Cardinal Alfredo Ottaviani, one of Defendant Holy See's officials, he prepared a report dated April 11, 1962.  In this report he discussed the various types of sexual problems of priests, including sexual abuse of minors:  "On the other hand, where a priest for many years has fallen into repeated sins which are considered, generally speaking, as abnormal (abuse of nature) such as homosexuality and most especially the abuse of children, we feel strongly

23

that such unfortunate priests should be given the alternative of a retired life within the protection of monastery walls or complete laicization."

85.     In 1963, Fr. Gerald Fitzgerald had a private audience with Supreme Pontiff Paul VI (1963-1978) and on August 27, 1963, submitted a report to the Supreme Pontiff at the Supreme Pontiff's request.  Concerning priests who sexually abuse minors he said to the Supreme Pontiff: "Problems that arise from abnormal, homosexual tendencies are going to call for, not only spiritual, but understanding psychiatric counseling.  Personally I am not sanguine of the return of priests to active duty who have been addicted to abnormal practices, especially sins with the young.....Where there is indication of incorrigibility, because of the tremendous scandal given, I would most earnestly recommend total laicization."  Defendant Holy See, chose to keep this report and knowledge a secret under its long standing policy to avoid scandal at all costs.  At this point Defendant Holy See knew that it had a widespread problem of its clergy sexually molesting minors, including in the United States, and it authorized, facilitated and participated in the creation of these facilities in the United States where sexually offending clergy could be sent before they were moved to another parish to work and potentially abuse again.

86.     Defendant Holy See's policy of secrecy under penalty of immediate removal from the organization (excommunication) for all involved in an accusation against clergy for the crime of solicitation—which includes sexual abuse of a minor—created a shroud of secrecy insulating priests from consequence.  This policy is explicitly laid out in the 1962 Vatican secret document, *Crimen Sollicitationis*.  It specifies in paragraph 4 that although the penalty for a Catholic member who violates the vow of secrecy regarding child sex abuse by clergy is usually excommunication, extreme cases can also result in removal from ministry or "they [the Ordinary, or controlling agent] will also be able to transfer him to another [assignment], unless the Ordinary of the place has

24

forbidden it because he has already accepted the denunciation and has begun the inquisition." Through this policy and others Defendant Holy See knowingly allowed, permitted and encouraged child sex abuse by its priests, including the Perpetrators.

87.    Defendant Holy See retains at all times the power over who conducts the "inquisition" that investigates claims regarding the "crime of solicitation." *Crimen Sollicitationis* at paragraph 2.   While it delegates power over such proceedings to its chosen agents, it retains the unilateral power at all times to "summon[] the case to itself." *Id*.   In addition, if it is unclear whether the "denounced person" is under the jurisdiction of any of Defendant Holy See's agents, the 1962 document orders the agent with knowledge of the abuse to send the case "to the Supreme Holy Congregation of the Holy Office." *Crimen Sollicitationis* at paragraph 31.

88.    Defendant Holy See specifically has carved out the treatment of child sex abuse by clergy from other employment issues in order to have continuing control over this issue.   Defendant Holy See governs it every day and perpetually according to non-negotiable and mandatory standards that it first set into place in 1867, which is approximately when civil law also outlawed child sex abuse, and then reiterated and elaborated in 1922, 1962 and 2001.   Defendant Holy See has defined the "worst crime" to be covered by its dictated procedures, standards, and mandatory treatment, as "any obscene, external act, gravely sinful, perpetrated in any way by a cleric or attempting by him with youths of either sex or with brute animals (bestiality)." *Crimen Sollicitationis* at paragraph 73.   There is no discretion given to its agents in the handling of such cases:

> What is treated in these cases has to have a greater degree of care and observance so that those same matters be pursued in a most secretive way, and, after they have been defined and given over to execution, they are to be restrained by a perpetual silence. (Instruction of the Holy Office, February 20, 1867, n. 14). Each and everyone pertaining to the tribunal in any way or admitted to knowledge of the matters because of their office, is to observe the strictest secret, which is commonly regarded as a secret of the Holy Office, in all matters

and with all persons, under the penalty of excommunication *latae sententiae*, ipso facto and without any declaration [of such a penalty] having been incurred and reserved to the sole person of the Supreme Pontiff, even to the exclusion of the Sacred Penitentiary, are bound to observe [this secrecy] inviolably. *Crimen Sollicitationis* at paragraph 11.

89.     Defendant Holy See mandates secrecy for all those involved, including agents and itself, in handling allegations of sexual abuse.  Penalties for the crime of solicitation include an order to move offending priests to other locations once they have been determined to be "delinquent."   In response to allegations, the document mandates that supplementary penalties include: "As often as, in the prudent judgment of the Ordinary, it seems necessary for the amendment of the delinquent, for the removal of the near occasion [of soliciting in the future], or for the prevention of scandal or reparation for it, there should be added a prescription for a prohibition of remaining in a certain place."  *Crimen Sollicitationis* at paragraph 64.  Defendant Holy See creates and maintains this policy of secrecy and transfers, threatening all involved with excommunication and, thus, damnation, if they do not comply.   According to *Crimen Sollicitationis,* once these non-discretionary penalties are levied, only Defendant Holy See through the Congregation of the Holy Office, has the power to alter or remit the punishment.

90.     In *Crimen Sollicitationis*, Defendant Holy See created a specific procedure which local ordinaries, as agents of Defendant Holy See were required to follow.  Moreover, the commandment of silence regarding cases of sexual abuse embodied in the instruction on penalty of removal (excommunication) operated to deprive the local agents of any meaningful discretion. Even if *Crimen Sollicitationes* can be read to allow the local agent of Defendant Holy See to choose one of a limited number of options, the instruction from Defendant Holy See nonetheless mandates which of those specific options should be chosen, and mandates how each is to be handled.  In addition, Defendant Holy See reserves to itself the power to reverse whichever of the limited set of options is chosen.

91.     Again in 1988, Defendant Holy See issued another mandatory and specific policy that reiterated that Defendant Holy See's Congregation for the Doctrine of Faith had the power over crimes against morals, which includes sexual abuse of children by priests.  This document was Apostolic Constitution called *Pastor Bonus.* (Available at http://www.bishop-accountability.org/AtAGlance/church_docs.htm, last visited December 6, 2019.)

92.     In 1990, Bishop A. James Quinn, at a Midwest Canon Law Society Meeting told of a policy where Bishops could send documents that "you really don't want people to see" to the Vatican embassy in Washington "because they have immunity." (Available at http://www.bishop-accountability.org/AtAGlance/church_docs.htm, last visited December 6, 2019.)

93.     Supreme Pontiff John Paul II issued an Apostolic Letter, *Sacramentorum Sanctitatis Tutela*, dated April 30, 2001, available at http://www.bishop-accountability.org/resources/resource-files/churchdocs/SacramentorumAndNormaeEnglish.htm (last visited December 6, 2019), which confirms the direct relationship between Defendant Holy See and employees who commit these crimes of solicitation.  The mandate supplemented the 1962 *Crimen Solicitationis* and confirmed its position as an executive disciplinary handbook:

> "It is to be kept in mind that an Instruction of this kind had the force of law since the Supreme Pontiff, according to the norm of can. 247, § 1 of the *Codex Iuris Canonici* promulgated in 1917, presided over the Congregation of the Holy Office, and the Instruction proceeded from his own authority… Supreme Pontiff Paul VI… confirmed the Congregation's judicial and administrative competence…Finally, by the authority with which we are invested, in the Apostolic Constitution, *Pastor Bonus,* promulgated on June 28, 1988, we expressly established, "[The Congregation for the Doctrine of the Faith] examines delicts against the faith and more grave delicts whether against morals or committed in the celebration of the sacraments, which have been referred to it and, whenever necessary, proceeds to declare or impose canonical sanctions according to the norm of both common and proper law," thereby further confirming and determining the judicial competence of the same Congregation for the Doctrine of the Faith as an Apostolic Tribunal.

94.     The 2001 mandate expressly reserved to Defendant Holy See's Congregation of the

Doctrine of the Faith the right to deal with allegations of child sex abuse against priests.

95.     Under the mandatory policy contained in the 2001 mandate, bishops, archbishops, cardinals and hierarchs are required to report any priest accused of sexual misconduct to Defendant Holy See's Congregation for the Doctrine of Faith.

96.     Actions of Defendant Holy See occurring in the United States include the transmission and receipt in the United States of policies, directives, orders or other direction or guidance, whether explicit or implicit.

97.     Plaintiff was harmed as a result of Defendant Holy See's practice and policy of not reporting suspected child abuse to law enforcement officials and requiring secrecy of all its agents who received reports of abuse.  There are children today who are in imminent danger of abuse because Defendant Holy See has failed to report or release the names of agents that have either been convicted or credibly accused of molesting children, or that Defendant Holy See itself has found guilty of abuse.

98.     There are a number of priests, brothers, bishops and agents who Defendant Holy See continued in ministry after Defendant Holy See knew or suspected that those agents had molested children.

99.     Defendant Holy See knew that there was a high probability that these clerics would sexually molest more children, but sought to protect itself from scandal, sought to keep its income stream going, at the peril of children.

100.    On information and belief, Defendant Holy See did not report all allegations of child sexual abuse by its agents and former agents to law enforcement, those directly in the path of danger, or the public.  Further, Defendant Holy See adopted and enforced a policy and practice where its agents were not supposed to report abuse by Defendant Holy See's agents to law

28

enforcement, those directly in the path of danger, or the public.

101.   After 2001, Defendant Holy See instructed its agents that all cases of sexual abuse by its agents were to be handled by Defendant Holy See.   Since then Defendant Holy See has learned of thousands of cases.   Defendant Holy See has not released the names of the sex offenders that it learned about since 2001 to the public and to law enforcement.

102.   Defendant Holy See continues to address and handle child sexual abuse cases internally, putting children at risk of harm.

103.   The United States Catholic Conference of Bishops has indicated that over 6,000 clerics have been accused of sexual abuse of minors between 1950 and 2016.   Not all of these names have been released to the public.

104.   In 2014, Defendant Holy See released statistics regarding clergy accused of abuse under pressure from the United Nations.   Archbishop Silvio Tomasi reported in 2014 that since 2004, more than 3,400 credible cases of abuse have been referred to Rome.   Of these, 848 priests had been laicized and 2,572 removed from ministry and sentenced to a lifetime of prayer and penance.   Defendant Holy See has not released these names to the public.

105.   The sexual abuse by clerics and concealment of information regarding sexual abuse is widespread.   For instance, beginning in 2012, ex-Prime Minister of Australia Julia Gillard announced the Royal Commission into Institutional Responses to Child Sexual Abuse.

106.   Almost two-thirds of the survivors abused in religious institutions in Australia were abused in Catholic institutions.   The Royal Commission identified 1,880 perpetrators from the Catholic Church only, 572 of those perpetrators being priests.   The abuse occurred in 964 different Catholic institutions.   The Royal Commission found the following:

      a.     Children (who came forward) were ignored or worse, punished.   Allegations

were not investigated;

b.     Documents were not kept or they were destroyed.  Secrecy prevailed as did cover-ups; and

c.     After offending, priests were transferred to other communities where they knew nothing of their past.

107.    While much of the abuse in religious institutions occurred prior to 1990, the Royal Commission identified more than 200 survivors abused in religious institutions since 1990.

108.    Defendant Holy See official and one of the leaders of the Catholic Church in Australia, Cardinal George Pell, has been implicated in the clergy sexual abuse scandal in Australia, yet continued to rise through the ranks of the Catholic Church.

109.    In 1993, Cardinal Pell accompanied a perpetrator, Gerald Ridsdale, to a court appearance and tried to "lessen [Ridsdale's] time in jail."  Subsequently, Cardinal Pell became Archbishop of Melbourne in 1996 and Archbishop of Sydney in 2001.

110.    Not only has Cardinal Pell publicly supported accused offenders, Cardinal Pell has also been accused of concealing child sexual abuse allegations.  Despite this, in 2014 Pell was appointed Secreteriat for the Economy for Defendant Holy See.

111.    Cardinal Pell was also accused of abusing minors himself and was convicted of five counts of criminal sexual conduct in December 2018 in Australia.  Supreme Pontiff Francis had granted Cardinal Pell a leave of absence prior to the criminal trial so he could "clear his name."

112.    Another Australian Archbishop, Philip Wilson, has also been accused of concealing child sexual abuse decades ago and was criminally convicted of concealing crimes of child sexual abuse in 2018.

113.    As early as 2010, Archbishop Wilson endured public scrutiny for his handling of

sexual abuse claims related to James Fletcher and Denis McAlinden in the Maitland-Newcastle Archdiocese.  Even in light of his role in the concealment of child sexual abuse, Defendant Holy See allowed Archbishop Wilson to continue his duties as Archbishop.  In March 2015 when Wilson was criminally charged, he took a leave of absence until January 2016 when he resumed his duties as Archbishop of Adelaide.  Supreme Pontiff Francis and Defendant Holy See did nothing to restrict the Archbishop's ministry or title during this period.  Supreme Pontiff Francis only accepted Wilson's resignation after Wilson was found guilty in 2018.

114.    On the island of Guam alone, approximately 160 lawsuits have been filed related to clergy sexual abuse, implicating priests and at least one archbishop with complaints dating back at least four decades.  Consequently, the Archdiocese of Guam filed for Chapter 11 Reorganization as a result of the claims against it.

115.    One of the accused offenders in Guam is former Archbishop Anthony Sablan Apuron, O.F.M. Cap. (hereinafter "Archbishop Apuron").  Archbishop Apuron was placed on leave in 2016 and an internal investigation was made into the allegations against Archbishop Apuron by a Vatican tribunal.  Archbishop Apuron was removed from office in March 2018 and found guilty of some of the allegations made against him, including crimes involving minors. After Archbishop Apuron appealed the Vatican tribunal's decision, Supreme Pontiff Francis indicated that he would review Archbishop Apuron's appeal personally.  However, Defendant Holy See did not release information about why Archbishop Apuron was removed or what he was found guilty of.

116.    Defendant Holy See has not publicized or corroborated information regarding the accused clerics in Guam.

117.    In Chile, Bishop Juan Barros Madrid has been accused by survivors of concealing

31

the sexual abuse of children by Fr. Fernando Karadima, one of the most notorious sexual abusers in Chile.

118.    One of Fr. Karadima's victims, Juan Carlos Cruz, testified that Bishop Barros witnessed Fr. Karadima sexually abusing him.  Despite this testimony, Supreme Pontiff Francis appointed Barros as Bishop of Osorno, Chile, in 2015, and defended Bishop Barros, calling the accusations "slander" and asking for "proof" that Bishop Barros was complicit in the cover-up of Fr. Karadima.

119.    In 2015, Supreme Pontiff Francis received a letter from Juan Carlos Cruz detailing Bishop Barros' involvement in the sexual abuse by Fr. Karadima.  It was not until 2018 that Supreme Pontiff Francis appointed Archbishop Charles Scicluna to investigate the Bishop Barros matter.  Since the investigation, Supreme Pontiff Francis has acknowledged that he made "grave errors" in judgment regarding the situation in Chile.  Only after the investigation and public scrutiny did Supreme Pontiff Francis accept the resignation of Bishop Barros.

120.    In the United States, Cardinal Bernard Law was accused of concealing information relating to child sexual abuse in the Boston Archdiocese.  Specifically, Cardinal Law knew that priest John Geoghan had sexually abused boys and been moved from parish to parish.  Despite this, upon his resignation as Archbishop of Boston, Cardinal Law was promoted in Rome and became an archpriest of one of Rome's basilicas.  He received a cardinal's funeral upon his death in 2017.

121.    Also in the United States, former Archbishop John Clayton Nienstedt of the Archdiocese of Saint Paul and Minneapolis authorized a priest, Fr. Curtis Wehmeyer, to work with and have access to children despite knowledge of his unfitness to be a priest and his history of sexual misconduct.  Fr. Wehmeyer went on to abuse at least three minor males during the

timeframe of approximately 2006 to 2012 and was eventually criminally convicted.

122.    In 2013, Archbishop Nienstedt himself was accused of sexual misconduct during his time as Archbishop of St. Paul and Minneapolis and before.  The allegations included sexual harassment of priests; unwelcome sexual propositioning of priests of the Archdiocese of St. Paul and Minneapolis and Diocese of Detroit; retaliation against a 19-year-old seminarian for refusing to go with Archbishop Nienstedt on a trip by having the seminarian removed from the seminary; that Nienstedt was known to frequent establishments catering to gay clientele in Canada and Detroit; and that Archbishop Nienstedt inappropriately touched a boy during a confirmation photograph.

123.    In 2014, a law firm hired to investigate Archbishop Nienstedt obtained 10 affidavits describing sexual misconduct by Archbishop Nienstedt, and appeared to discover a personal relationship between Archbishop Nienstedt and Fr. Wehmeyer prior to Fr. Wehmeyer's arrest. Witnesses reported seeing Archbishop Nienstedt leaving Fr. Wehmeyer's rectory early in the morning and visiting in the evenings.  One witness reported hearing Fr. Wehmeyer remark on multiple occasions that he had dinner with Archbishop Nienstedt the previous evening.  Other priests described Archbishop Nienstedt interfering with their careers after they refused Archbishop Nienstedt's sexual advances.

124.    In April 2014, Auxiliary Bishop Andrew Cozzens, Bishop Lee Piché, and Archbishop Nienstedt all from the Archdiocese of St. Paul and Minneapolis met with the papal nuncio, Archbishop Carlo Maria Viganò in Washington D.C.

125.    The papal nuncio, referred to officially as the Apostolic Nuncio, is Defendant Holy See's agent and representative in the United States and facilitates communications between Defendant Holy See and the United States' bishops and dioceses.  Communications between the

various bishops in the United States and the Holy See are made through the papal nuncio.

126.    The papal nuncio at the time, Archbishop Carlo Maria Viganò, in essence shut down the law firm's investigation into Archbishop Nienstedt.

127.    In 2018, the Supreme Pontiff Francis accepted the resignations of Archbishop John Nienstedt and Auxiliary Bishop Lee Anthony Piche who resigned due to their mishandling of the Fr. Wehmeyer situation.   This was after the Archdiocese of St. Paul and Minneapolis was criminally and civilly charged for its wrongdoing regarding Fr. Wehmeyer.

128.    Archbishop Nienstedt remains a priest in good standing and a bishop emeritus today.

129.    Also in Minnesota, Bishop Michael Hoeppner in the Diocese of Crookston settled a lawsuit in 2017 brought against him individually for coercion and intentional infliction of emotional distress after he forced a survivor of sexual abuse to recant his report of abuse.   In the process, Bishop Hoeppner violated a state court order requiring him to disclose the names and files of priests accused of abuse in the Crookston Diocese.

130.    Bishop Hoeppner remains the bishop in the Diocese of Crookston despite suppressing evidence of child sexual abuse after being ordered to produce such information by a state court judge.

131.    In 2019, Archbishop Bernard Hebda of the Archdiocese of St. Paul and Minneapolis was tasked by the Holy See with investigating Bishop Hoeppner for his misconduct under the Supreme Pontiff's motu proprio enacted in May 2019, *Vos estis lux mundi*.   Archbishop Hebda submitted his findings to the Vatican Congregation for Bishops in Rome in the fall of 2019.

132.    Another Bishop, Richard J. Malone, was also investigated under direction of the Holy See by Diocese of Brooklyn Bishop Nicholas DiMarzio in October 2019.   Bishop Malone

was criticized for his mishandling of clergy misconduct and the sexual abuse crisis in the Buffalo, New York Diocese.

133.    After Bishop DiMarzio submitted his investigative findings to the Congregation for Bishops, the Supreme Pontiff approved Bishop Malone's resignation in December 2019.  Bishop Malone is no longer the bishop of the Diocese of Buffalo, New York.  Upon former Bishop Malone's resignation, Supreme Pontiff appointed Bishop Edward B. Scharfenberger as apostolic administrator of the Diocese of Buffalo, New York.

134.    In 2017, Msgr. Carlo Alberto Capella was accused by United States authorities of possessing and distributing child pornography.  Capella worked as a diplomat at Defendant Holy See's embassy in Washington, D.C.  Instead of leaving Capella to be prosecuted in the United States, the Vatican invoked diplomatic immunity and Capella was recalled to the Vatican for investigation.

135.    Nearly seven months later, in April 2018, the Vatican police arrested Capella after the Vatican's Promotor of Justice conducted an investigation into the child pornography charges. A Vatican court sentenced Capella to five years in prison for the possession and distribution of child pornography in June 2018.

136.    Supreme Pontiff Francis has reiterated Supreme Pontiff Benedict's pledge of "zero tolerance" when it comes to sexual abuse of minors.  Despite this, Defendant Holy See continues to address allegations of child sexual abuse internally, refusing to release the names of the accused and promoting individuals who either perpetrated the abuse or helped conceal it.

137.    Supreme Pontiff Benedict blamed the clergy sexual abuse crisis in the Catholic Church on the sexual revolution and liberalization of the Catholic Church's moral teachings.

138.    Defendant Holy See has known that child molesters have a very high rate of

recidivism, meaning that they are likely to sexually abuse more children. As such, Defendant Holy See knew that children, parents, and guardians who did not possess Defendant's knowledge about its agents and former agents and who unsuspectingly were around these agents and former agents were at a high risk to be sexually molested.

139. Because of the high rate of recidivism, Defendant Holy See's agents and former agents molested numerous children. As such, Defendant Holy See knew that there were many victims that were hurt because of Defendant Holy See's policies of secrecy, deception, and self-protection.

140. Children are at risk because the public and law enforcement do not know the identity and the locations of these agents and former agents of Defendant Holy See who have been accused of sexual misconduct.

141. Promises made by Defendant Holy See to address child sexual abuse have not been kept.

142. In 2014, Supreme Pontiff Francis instituted a Pontifical Commission for the Protection of Minors ("PCPM"). This PCPM mandate ended in 2017 without a commitment from Supreme Pontiff Francis to renew the Commission. The PCPM was recently renewed in February 2018 after Supreme Pontiff Francis received criticism for his handling of the Bishop Barros matter in Chile. Two survivors appointed to the Commission terminated their involvement prior to its culmination because Defendant Holy See refused to implement recommendations that would protect children.

143. In 2015, Supreme Pontiff Francis announced that he was going to create a tribunal inside the Congregation for the Doctrine of Faith to investigate and prosecute bishops who concealed sexual abuse. In 2016, Supreme Pontiff Francis announced that the tribunal would not

be created.

144.     Supreme Pontiff Francis and Defendant Holy See have the sole authority and power to dictate policies, procedures, and protocols regarding the Catholic Church.  Most recently, this includes the following:

        a.     In April 2016, Supreme Pontiff Francis issued an Apostolic Exhortation calling for Catholics to be more inclusive of homosexuals, divorced, and remarried Catholics;

        b.     In December 2017, Defendant Holy See issued a decree stating that one cannot sell the hair strands, hands, teeth, or other body parts of saints;

        c.     In February 2018, Supreme Pontiff Francis imposed a mandatory retirement age on clerics;

        d.     In 2018, Defendant Holy See gave permission to the Diocese of Winona in Minnesota to change its name to the Diocese of Winona-Rochester;

        e.     In March 2018, Supreme Pontiff Francis issued an Apostolic Exhortation calling for Catholics to embrace holiness; and

        f.     In March 2019, Defendant Holy See prevented Archbishop Samuel J. Aquila in Denver, Colorado, from closing a parish.

145.     In 2018, Defendant Holy See prevented the United States Catholic Conference of Bishops from taking action and voting on measures drafted in response to the child sexual crisis in the United States, including the creation of a commission for receiving complaints about Bishops and establishing standards of accountability for Bishops.

146.     In March 2019, Supreme Pontiff Francis issued Norms requiring sexual abuse claims be reported to Vatican officials, however, the Norms only mandated reporting within

Vatican City and only to Vatican officials.

147.     In May 2019 in response to the McCarrick scandal, Supreme Pontiff Francis issued a decree regarding reporting clergy sexual abuse and attempts to conceal clergy sexual abuse: *Vos estis lux mundi*.  Available at http://press.vatican.va/content/salastampa/it/bollettino/pubblico/2019/05/09/0390/ 00804.html#EN (last visited December 6, 2019).  The decree fails to protect children for several reasons including, but not limited to:  1) requiring abuse to be reported to religious superiors within the Church, not the civil authorities; 2) religious superiors are not mandated to report the abuse to the civil authorities; 3) information regarding the reports is to remain confidential; 4) clear penalties are not imposed for failing to report; and 4) the decree is not retroactive.  Supreme Pontiff Francis has not issued any meaningful decree or Apostolic Exhortation regarding the prevention of clergy sexual abuse despite his authority to do so.

148.     At all times material, Defendant Holy See employed priests, including McCarrick, to provide religious and pastoral services.  The duties of McCarrick were limited to performing ecclesiastical and parochial services.  At no time did he perform legislative work or governmental functions on behalf of Defendant Holy See, and he was not a civil servant or diplomatic or military employee of the sovereign Holy See.  McCarrick was employed by Defendant Holy See as a cardinal, bishop, and priest.  The duties of McCarrick's employment included, but were not restricted to, teaching the word of God and the law of the church; providing religious, educational, and counseling services; and obtaining financial support for the Church.  Defendant Holy See controlled McCarrick, was responsible for punishment if there was wrongdoing, and had some stake in paying McCarrick for his services.  Defendant Holy See controlled all aspects of McCarrick's conduct including his clothing, his routine, his practices, and his teachings.

Defendant Holy See also supplied McCarrick with materials for his fundraising and solicitation of property.  Defendant Holy See had the sole authority to remove McCarrick from his position as a cardinal, bishop, and priest.  At all times material, McCarrick was a Roman Catholic priest, employed by and agent of Defendant Holy See, under its direct supervision and control, particularly on the issue of child sex abuse.

149.    Defendant Holy See also employed priests to recruit and solicit adults and children to become members of the financial operation so that the new members would contribute money.

150.    At his ordination, McCarrick and other priests agreed to be obedient to their bishop and Defendant Holy See (the Supreme Pontiff).

151.    Defendant Holy See has complete and final control over each bishop, archbishop, cardinal, religious order provincial, religious leader and priest within the Catholic Church.

152.    Defendant Holy See is a traditional monarchy, which means that it holds all authority in the first instance and any authority held by others within the institution is delegated from Defendant Holy See.  Defendant Holy See has reaffirmed this on numerous occasions, including in its book of rules and regulations.

153.    Defendant Holy See has complete and total control, including day-to-day control, over each aspect of the Catholic Church.  To the extent that some of the entities underneath Defendant Holy See's absolute control are separate corporations, Defendant Holy See maintains complete control over these separate corporations.  Defendant Holy See directs and requires each of these entities to strictly follow all of its policies and procedures, requires each of these entities to report its activities to Defendant Holy See, requires each cleric working with the separate corporation to swear absolute obedience to Defendant Holy See, and is the only entity that can create or terminate these corporations.  And with respect to the particular issue of child sex abuse,

Defendant Holy See demands complete and unswerving obedience regarding procedures, the scope of potential penalties, and how each case will be disposed of ultimately.

154.    Any corporations including, but not limited to, any archdiocese or diocese in New York which was or is incorporated, were and are an alter ego of Defendant Holy See.  Defendant Holy See retained and does still retain complete and final control over these corporations. Defendant Holy See has day-to-day control of these entities through mandatory policies and procedures, mandatory meetings, mandatory obedience, and dictation of most aspects of their agents' lives.

155.    Additionally, Defendant Holy See determined long ago that it would require some of the entities under its control to incorporate in order to reduce Defendant Holy See's exposure to claims by people that it harmed, in order to keep the public from discovering Defendant Holy See's involvement in the systematic cover-up and concealment of child sex abuse by its agents, and in order to defraud those people that its agents harmed, including those that its agents sexually abused as children.

156.    Defendant Holy See is the only entity that can fire a priest.

157.    Defendant Holy See is the only entity that can fire a bishop, cardinal, or religious leader.

158.    McCarrick was a fundraiser and solicitor of members for Defendant Holy See.  He raised a great deal of resources for Defendant Holy See.  McCarrick was also able to recruit numerous children, adults and families to become paying members of Defendant Holy See's organization.

159.    Defendant Holy See wanted to retain McCarrick's services as a fundraiser and recruiter.

160.    McCarrick was ordained a priest in the Archdiocese of New York, New York, in 1958 and promised obedience to Defendant Holy See (the Supreme Pontiff) and the Archbishop of the Archdiocese of New York.   McCarrick remained under Defendant Holy See's direct supervision, employ and control during all times material to this Complaint.

161.    Following his ordination, McCarrick was authorized to represent himself as a priest of Defendant Holy See, to wear the uniform or vestments of a priest, to teach and counsel the public, including minors, on behalf of Defendant Holy See and to otherwise exercise the rights, privileges and responsibilities of a Roman Catholic priest.

162.    McCarrick was authorized to be a priest, bishop, and cardinal of Defendant Holy See, despite knowledge of his unfitness to be a priest and have access to children.

163.    From 1959 to 1966, McCarrick was assigned outside of the Archdiocese of New York on special assignment at The Catholic University of America in Washington D.C.

164.    From 1967 to 1969, McCarrick was assigned to the Catholic University of Puerto Rico in Ponce, Puerto Rico.

165.    Upon information and belief, from approximately 1969 to 1976, McCarrick repeatedly sexually abused James Grein on multiple instances when Grein was a minor.  The abuse continued for years into Grein's adulthood.

166.    From 1970 to 1971, McCarrick was assigned to Blessed Sacrament in New York, New York.

167.    Upon information and belief, from approximately 1970 to 1990, McCarrick sexually assaulted at least 7 minor boys.

168.    From 1972 to 1977, McCarrick was assigned to Cathedral of St. Patrick in New York, New York.

169.    Upon information and belief, in 1971 and 1972, at Christmas Masses in each of those years, McCarrick sexually assaulted a minor altar boy who was 16 and 17 years old, respectively, and who had been selected to assist McCarrick with serving Christmas Mass.

170.    In 2018, after these sexual assaults were reported and were investigated, the Archdiocese of New York found the allegations of this sexual abuse by McCarrick against a minor occurring in 1971 and 1972 credible and substantiated.

171.    From 1978 to 1980, McCarrick was assigned to St. Francis De Sales in New York, New York.

172.    In 1978, McCarrick was appointed Auxiliary Bishop of the Archdiocese of New York by the Supreme Pontiff, acting as the head of state of Defendant Holy See, where McCarrick served until 1981.

173.    In 1981, McCarrick was assigned to the New York Foundling Hospital in New York, New York.

174.    In 1982, McCarrick was appointed Bishop of the Diocese of Metuchen, New Jersey by the Supreme Pontiff, acting as the head of state of Defendant Holy See, where McCarrick served until 1986.

175.    In 1987, McCarrick was appointed Archbishop of the Archdiocese of Newark, New Jersey by the Supreme Pontiff, acting as the head of state of Defendant Holy See, where McCarrick served until 2000.

176.    In the late 1980s, when Reverend Boniface Ramsey, O.P., was teaching at Immaculate Conception Seminary, McCarrick was Archbishop of Newark and Immaculate Conception was his seminary.  At this time, Rev. Ramsey reported his concerns about McCarrick's inappropriate conduct with seminarians to the rector of the seminary.

177.    Upon information and belief, in approximately 1988 while McCarrick was Archbishop of the Archdiocese of Newark, New Jersey, McCarrick brought James Grein to the Vatican to meet Supreme Pontiff John Paul II.  Upon information and belief, out of the presence of McCarrick, Grein informed the Supreme Pontiff in the presence of other Vatican officials that he had been sexually abused by McCarrick since he was a young child.  The Supreme Pontiff and Defendant Holy See took no action to prevent the continued abuse of Grein or others, including Plaintiff.

178.    In 1993, Fr. Ramsey expressed concerns to his friend the Archbishop of Louisville, Kentucky Thomas Kelly, O.P. regarding McCarrick's conduct with seminarians.  Archbishop Kelly responded, "We all know."

179.    In 1993, the Diocese of Metuchen was informed about McCarrick's sexual exploitation of a young seminarian.

180.    In 1994, a priest of the Diocese of Metuchen wrote to the Bishop of the Diocese of Metuchen, Edward T. Hughes, that McCarrick had inappropriately touched him when he was a seminarian.

181.    Upon information and belief, from 1994 to 2008, multiple reports about McCarrick's transgressions with seminarians were made to American bishops, the Supreme Pontiff's representative in Washington, and Supreme Pontiff Benedict XVI.

182.    Upon information and belief, in 1994, Robert Hoatson, a former New Jersey priest, as a young religious brother, expressed concern about McCarrick sleeping with seminarians to an official in the Archdiocese of Newark.

183.    In 1997, McCarrick, a founding member of The Papal Foundation, began serving as its President.  The Papal Foundation provided funds to the Vatican and Catholic Missions.

184.    In 2000, McCarrick began serving as a Board member of Catholic Relief Services. He served on that Board until 2014.  Catholic Relief Services provided funds to the Vatican and Catholic Missions.

185.    In 2000, Fr. Ramsey sent a letter to Nuncio Archbishop Gabriel Montalvo expressing his concerns about McCarrick and his inappropriate behavior with seminarians.

186.    In 2001, McCarrick was appointed Archbishop of Washington, D.C. by Supreme Pontiff John Paul II acting as the head of state of Defendant Holy See.  That same year, Supreme Pontiff John Paul II, acting as the head of state of Defendant Holy See, also appointed McCarrick as a Cardinal.  McCarrick served as Cardinal Archbishop of Washington, D.C. until his retirement in 2006.

187.    Upon information and belief, in 2002, McCarrick announced the new Vatican policy on sexual abuse by priests from Rome.  McCarrick outlined a multi-step process in which an accused priest would be put on administrative leave and removed from clerical duties while a case was investigated.

188.    Upon information and belief, in the early to mid-2000s, two former priests, Robert Ciolek and an unnamed man, were paid settlements for harassment and sexual abuse they suffered by McCarrick in the 1980s when they were seminarians.

189.    In 2018, Carlo Maria Viganò, Titular Archbishop of Ulpiana and former Apostolic Nuncio in the United States, released a letter indicating that the Holy See had been informed in at least 2000 of McCarrick's "gravely immoral behavior with seminarians and priests."

190.    In 2018, Fr. Ramsey released an October 2006 letter that he had received from a top official of the Vatican Secretariat of State.  In the letter, then-Archbishop Leonardo Sandri acknowledged receipt of the allegations regarding McCarrick in 2000.

191.    Upon information and belief, after 2008, sanctions were imposed by Supreme Pontiff Benedict XVI upon McCarrick due to his inappropriate behavior with seminarians and fellow priests.  The sanctions provided that McCarrick leave the seminary where he was living, and McCarrick was forbidden to celebrate public Mass, participate in public meetings, or travel with the obligation of dedicating himself to a life of prayer and penance.

192.    Upon information and belief, the sanctions imposed by Pontiff Benedict XVI were not enforced.

193.    On information and belief, in 2009, in violation of Pontiff Benedict XVI's sanctions, McCarrick continued to travel and celebrate public Mass, and did so with noteworthy officials.  This included a celebration of public Mass by McCarrick with the Dominican Sisters in Summit, New Jersey.

194.    Upon information and belief, during 2011, 2012, and 2013, in violation of Pontiff Benedict XVI's sanctions, McCarrick continued to travel and celebrate public Mass.

195.    Archbishop Viganò indicated in his 2018 letter that he informed Supreme Pontiff Francis of McCarrick's inappropriate behavior and history of abuse in 2013: "Holy Father, I don't know if you know about Cardinal McCarrick, but if you ask the Congregation for Bishops there is a dossier this thick about him.  He corrupted generations of seminarians and priests and Supreme Pontiff Benedict ordered him to withdraw to a life of prayer and penance."

196.    Upon information and belief, in 2013, laicization of McCarrick was initiated.

197.    Upon information and belief, in May 2017, a victim of McCarrick sought participation in the ADNY's Independent Reconciliation and Compensation Program.

198.    Upon information and belief, Defendant Holy See gave ADNY permission to investigate the allegation against McCarrick.

199.   Upon information and belief, in July 2018, ADNY determined that the allegation was "credible and substantiated."

200.   Supreme Pontiff Francis remained complicit in the cover-up of McCarrick and did not take action as to McCarrick or accept McCarrick's resignation from the College of Cardinals until July 2018 after several accusations that McCarrick had sexually abused minors became public.

201.   On August 12, 2018, the Office of Attorney General of the Commonwealth of Pennsylvania released its Grand Jury Report regarding child sex abuse in Catholic Dioceses within Pennsylvania.

202.   On August 25, 2018, Archbishop Viganò publicly released his letter concerning information about McCarrick.

203.   Upon information and belief, on February 13, 2019, McCarrick was defrocked.

204.   Upon information and belief, in August 2019, Seton Hall Seminary announced findings from a report they had commissioned for an independent review.

205.   The independent review found that, "McCarrick created a culture of fear and intimidation that supported his personal objectives.  McCarrick used his position of power as then-Archbishop of Newark to sexually harass seminarians."

206.   The review further found that the Title IX policies in place "were not always followed at Immaculate Conception Seminary and St. Andrew's Seminary, which resulted in incidents of sexual harassment going unreported to the University."

207.   On November 14, 2019, Cardinal Sean O'Malley reported to the U.S. Conference of Catholic Bishops that the Vatican intended to publish its response to the investigation of McCarrick in November, but the scope of the investigation necessitated a later publishing date.

208.    Upon information and belief, the Vatican has not revealed the findings of its investigation of McCarrick to date.

209.    Plaintiff was raised in a devout Roman Catholic family and attended St. Francis of Assisi in Hackensack, New Jersey, in the Archdiocese of Newark.  Plaintiff and Plaintiff's family came in contact with McCarrick as an agent and representative of the Archdiocese of Newark, New Jersey, St. Francis of Assisi, and Defendant Holy See.

210.    Upon information and belief, Defendant Holy See allowed McCarrick to have unsupervised and unlimited access to children, including in the Archdiocese of Newark and at St. Francis of Assisi.

211.    McCarrick's duties and responsibilities in the Archdiocese of Newark included recruiting and soliciting children in the neighborhood and their families to become members of Defendant Holy See's organization so that they would pay money to the organization.

212.    By placing McCarrick and allowing him to work with children in the Archdiocese of Newark and at St. Francis of Assisi and by allowing McCarrick to recruit and solicit children to become members, Defendant Holy See affirmatively represented to minor children and their families, including Plaintiff, that McCarrick did not have a history of molesting children and was not a danger to children, that Defendant Holy See did not know or suspect that McCarrick had a history of molesting children and that Defendant Holy See did not know that McCarrick was a danger to children.

213.    Defendant Holy See was in a specialized position where it had knowledge that Plaintiff did not.  Defendant was in a position to have this knowledge because it was McCarrick's employer, because Defendant was responsible for McCarrick and because its policies mandated secrecy with respect to the sort of knowledge learned about McCarrick.

214.    Plaintiff on the other hand was a child. As a child he was not in a position to have information about McCarrick's molestation of other children or Defendant Holy See's knowledge of the danger McCarrick posed to children. Nor was he in a position to know that Defendant Holy See mandated that its employees keep such knowledge from others, including children like him.

215.    In addition to the representations regarding safety being made directly to Plaintiff, Defendant Holy See made these representations with knowledge and intent that they would be communicated to the minor Plaintiff through his parents/caregivers' words and actions. Defendant Holy See also had reason to believe that the representations made to Plaintiff's parents/caregivers would influence Plaintiff and particularly that the representations would influence the amount and type of time spent alone with McCarrick, McCarrick's access to Plaintiff, and McCarrick's ability to molest Plaintiff.

216.    Particularly, Defendant Holy See knew or should have known that McCarrick was a child molester and knew or should have known that McCarrick was a danger to children before McCarrick molested Plaintiff.

217.    Because of the superiority and influence that Defendant Holy See had over him, Plaintiff believed and relied upon these misrepresentations.

218.    McCarrick sexually molested Plaintiff when Plaintiff was approximately 13 or 14 years old in approximately 1995 or 1996. This abuse occurred while Plaintiff was a minor.

219.    McCarrick engaged in a similar course of conduct and pattern of sexual predation of devout Catholic youth under his control.

220.    Had Plaintiff or his family known what Defendant Holy See knew or should have known--that McCarrick was a suspected child molester and a danger to children before Plaintiff was first molested by McCarrick--Plaintiff would not have been sexually molested.

221.    Had Plaintiff and his family known that Defendant Holy See knew that there was a widespread problem of its agents sexually molesting children using the confessional, Plaintiff would not have been abused.

222.    As a direct and proximate result of Defendant Holy See's conduct described herein, Plaintiff has suffered a monetary loss, a loss of Plaintiff's time, a loss of Plaintiff's labor and a loss of Plaintiff's services.

223.    If Defendant Holy See had not engaged in its vast enterprise of soliciting funds, recruiting members, and other commercial activities, and had not deceived Plaintiff while undertaking this commercial activity, Plaintiff would not have been abused.

224.    Peter's Pence, Defendant Holy See's seminary activities, its solicitation of funds, and the other commercial and business activities described herein all had a direct role in causing Plaintiff's harms.

225.    Defendant Holy See has concealed and continues to conceal important information about its priests accused of sexual abuse of children.

226.    Upon information and belief, prior to and since 2004, Defendant Holy See failed to report multiple allegations of sexual abuse of children by its agents to proper civil authorities.  As a result, children are at risk of being sexually molested.

227.    As a direct result of Defendant's conduct described herein, Plaintiff John Bellocchio has suffered, and will continue to suffer, great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, physical, personal and psychological injuries.  Plaintiff was prevented, and will continue to be prevented, from performing normal daily activities and obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for psychological

treatment, therapy, and counseling, and, on information and belief has and/or will incur loss of income and/or loss of earning capacity.   The amount of Plaintiff's damages will be fully ascertained at trial.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

228.   Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

229.   A contract was formed between Plaintiff and his family, on the one hand, and Defendant on the other, when Plaintiff's family agreed to place their child in McCarrick's care and allowed him to be on the parish premises and in the Archdiocese of Newark.   Plaintiff was a party to and intended beneficiary of this contract.

230.   This contract was continually renewed as Plaintiff and his family year after year continued their support of Defendant.

231.   Additional contracts were formed when McCarrick developed a special relationship with Plaintiff.

232.   One of the implied terms of these contracts was to keep Plaintiff safe from child sexual assault.

233.   Another implied term of the contracts was that Defendant would not employ priests who are child sexual abusers.

234.   Another implied term of the contracts was that the Defendant would not conceal knowledge of sexual abuse by agents from children and their families.

235.   Another implied term of the contracts was that the Defendant would provide a reasonably safe environment.

236.   Another implied term of the contracts was that the Defendant would not allow

parishioners and children to be sexually molested and abused.

237. Another of the implied terms of the contracts was that if priests or other employees of Defendant observed, or became aware of, the Plaintiff being sexually abused by a priest, they would immediately take the necessary steps to cause the illegal and outrageous conduct to cease.

238. Another of the implied terms of the contracts was that neither priests nor other employees in the Archdiocese of Newark would sexually abuse minor children.

239. Defendant breached these duties under each of the contracts formed with Plaintiff's family, in part for the benefit of Plaintiff.

240. As a direct result of Defendant's breach of its contractual duties, Plaintiff has suffered the injuries and damages described herein.

241. As a direct result of Defendant's breach of its contractual duties, Plaintiff and his family suffered a loss of money and a loss of Plaintiff's services.

## SECOND CAUSE OF ACTION
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

242. Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

243. The contract formed between Plaintiff and his family, on the one hand, and Defendant on the other, included an implied covenant of good faith and fair dealing.

244. Defendant breached the implied covenant of good faith and fair dealing and thereby deprived Plaintiff of the right to receive the benefits under the contract.

245. As a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered the injuries and damages described herein.

246. As a direct result of Defendant's breach of its contractual duties, Plaintiff and his family suffered a loss of money and a loss of Plaintiff's services.

## THIRD CAUSE OF ACTION
## DECEPTIVE TRADE PRACTICES (NY GBL § 349)

247.     Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

248.     At all times material, Defendant Holy See engaged in the business of recruiting and soliciting people to become members and contribute to the financial operation of the Roman Catholic Church.

249.     At all times material, Defendant Holy See continues to hold the Roman Catholic Church out as being able to provide a safe environment for children and its leaders and people working at Catholic institutions, including McCarrick, as safe to work with children, despite knowledge of the widespread problem of child sexual abuse committed by its clergy.

250.     Defendant Holy See has engaged in unlawful, unfair, fraudulent or deceptive business practices including, but not limited to, concealing and covering up the widespread problem of child sexual abuse committed by its clergy.

251.     Defendant Holy See's unlawful, unfair, fraudulent or deceptive business practice includes, but is not limited to:   1) concealing the sexual assaults of, the identities and the pedophilic/ephebophilic tendencies of McCarrick and its other agents; and/or 2) concealing from proper civil authorities sexual assaults and abuse committed by McCarrick and its other agents against minor children; and/or 3) attacking the credibility of victims of Defendant Holy See's agents; and/or 4) protecting Defendant Holy See's agents from criminal prosecution for their sexual assaults and abuse against children; and/or 5) allowing known child molesters to live freely in the community without informing the public; and/or 6) violating the terms of relevant international laws at the expense and safety of children; and/or 7) after receiving reports or notice of misconduct by clerics such as McCarrick, transferring them to new parishes without any

warning to parishioners or the general public of the threat posed by such clerics; and/or 8) making affirmative representations regarding McCarrick's and Defendant Holy See's other pedophilic and/or ephebophilic agents' fitness for employment in positions that include working with children, while failing to disclose negative information regarding sexual misconduct by clerics.

252.   Defendant Holy See's concealment, misrepresentations, and inadequate disclosures about child sexual assaults committed by McCarrick and its other agents constitute unlawful, unfair or fraudulent business practices because it creates a false impression about the standard and quality of the business of Defendant Holy See, specifically the safety of children participating in its programs and living in unsuspecting communities and working with and around children.

253.   Defendant Holy See has engaged in unlawful, unfair, fraudulent or deceptive business practices by promulgating policies which harbor and protect abusive priests and prevent disclosure of reports of child sex abuse.

254.   Defendant Holy See has engaged in unlawful, unfair or fraudulent business practices by directing its agents in New York, the United States and worldwide to conceal from its parishioners and the general public at large the sexual assaults of children committed by its priests, bishops, clerics, agents and employees in order to avoid public scandal and to ensure continued receipt of funds from its parishioners and continued membership from its parishioners.

255.   Defendant Holy See's unlawful, unfair or fraudulent business practices have continued to perpetuate sexual assaults and impunity of its agents who have committed child sex abuse.

256.   Defendant Holy See's practices were and are likely to mislead the general public at large as to the safety and quality of the business of Defendant Holy See and/or the efforts made by Defendant Holy See to address the problem of child sex abuse by its priests, bishops, clerics, agents

and employees.

257.    These unlawful, unfair or fraudulent business practices are likely to continue and therefore will continue to mislead the public at large as to the real risk of sexual assaults by its priests, bishops, clerics, agents and employees.

258.    As a result of Defendant Holy See's unlawful, unfair or fraudulent business practices, Plaintiff was sexually abused by McCarrick and has suffered the injuries and damages described herein, including pecuniary loss in the form of medical expenses and/or wage loss.

259.    As a direct and proximate result of Defendant Holy See's conduct, Defendant Holy See has received and continues to receive financial contributions and continued support from members of the general public at large.

260.    Plaintiff requests a permanent injunction pursuant to restraining and enjoining Defendant from continuing the acts of unlawful, unfair and/or fraudulent business practices set forth above by discontinuing its current practice and policy of dealing with allegations of child sexual abuse by its agents, and that it work with civil authorities to create, implement and follow a policy for dealing with such molesters that will better protect children and the general public from further harm.

261.    During the pendency of this action, a preliminary injunction issued to enjoy and restrain Defendant Holy See from the acts of unlawful, unfair and/or fraudulent business practices set forth above by an order requiring that Defendant Holy See publicly release the names of all agents, including priests, accused of child molestation, each agent's history of abuse, each such agent's pattern of grooming and sexual behavior, and his or her last known address.  This includes the release of Defendant Holy See's documents on the agents.

## FOURTH CAUSE OF ACTION
## FALSE ADVERTISING (NY GBL § 350)

262.    Plaintiff incorporates all consistent paragraphs of this complaint as if fully set forth under this count.

263.    Defendant, by and through its agents, servants and employees, has engaged in a practice of purposeful, reckless, or negligent conduct in order to create a materially misleading impression about the safety and environment at its parishes, youth programs, and other activities.

264.    Defendant has disseminated false statements to the public and consumers at large, including Plaintiff and his family, about its handling and knowledge of sexual abuse at its facilities and its efforts to protect children, and has failed to disclose material information to the public, including Plaintiff and his family, about the dangerous propensities it knew or should have known a number of its agents possessed in an effort to protect itself from scrutiny and cast itself in a positive light so that it can sell and/or increase consumption of the services it provides to the public.

265.    As a result of Defendant Holy See's conduct, Plaintiff has suffered the injuries and damages described herein.

## FIFTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

266.    Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

267.    Defendant's conduct was extreme and outrageous.

268.    Defendant's conduct was done with the intention of causing, or reckless disregard of the probability of causing, severe emotional distress to Plaintiff.

269.    As a proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer severe or extreme emotional distress.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF CUSTOMARY INTERNATIONAL LAW OF HUMAN RIGHTS**

270. Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

271. The instructions, mandates and dictates of Defendant Holy See in the United States prohibiting the disclosure of the identity and existence of pedophiles and sexual predators under its control, thereby placing children in a position of peril, is a gross violation of established, universally recognized norms of international law of human rights. The customary international law of human rights has been codified in various international agreements including, but not limited to:

a. the *Universal Declaration of Human Rights,* in that Defendant Holy See as a matter of policy, at all times practiced, ignored, tolerated, disregarded, permitted, allowed, condoned or failed to report child sexual abuse which the international community and the civilized world views as cruel, inhumane and degrading; and

b. the *Convention on the Rights of the Child,* in that Defendant Holy See among other things, did not make the interests of minor children in its control their primary responsibility; did not conform to international standards for the safety and health of those children in considering the suitability of their priests, clerics, bishops, archbishops, cardinals, agents and servants; did not take all appropriate legislative, administrative, social and educational measures to protect those children from sexual abuse; did not prevent, identify, report, investigate, treat or follow-up on instances of child sexual abuse of which it had knowledge; did not take all appropriate measures to ensure that school discipline was administered in a manner consistent with human dignity; and did not undertake to protect those children from sexual exploitation and abuse.

272.    Defendant Holy See signed the *Universal Declaration of Human Rights* in 1948; Defendant Holy See signed the *Convention on the Rights of the Child* in 1990.

273.    The worldwide acceptance of various international agreements, including the *Convention on the Rights of the Child,* demonstrates that some of their provisions have attained the status of customary international law.  The *Convention on the Rights of the Child* provides that "in all actions concerning children . . . the best interests of the child shall be a primary consideration," Art. 3, that the signatories "shall take all appropriate legislative, administrative, social and educational measures to protect the child from all forms of physical or mental violence, injury or abuse, . . . , including sexual abuse," Art. 19, and that they "undertake to protect the child from all forms of sexual exploitation and sexual abuse," Art. 34.  These provisions codify longstanding legal human rights norms that reflect actual practices of states in prohibiting child sexual abuse, are not so novel as to be considered outside the bounds of what is customary, and are of universal concern.

274.    The practices, instructions, mandates, and dictates of Defendant Holy See in the United States prohibiting the disclosure of the identity and existence of pedophiles and sexual predators under its control and thereby placing children in positions of harm, whether undertaken under the color of law or only in its capacity as a private actor, are violations of customary international law, and are crimes to which the law of nations attributes individual responsibility.

**SEVENTH CAUSE OF ACTION**
**INJUNCTION FOR RELEASE OF NAMES OF SEX OFFENDERS**

275.    Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

276.    Defendant Holy See's practices have endangered numerous children in the past and these practices will continue to put children at risk in the future.

277.    Plaintiff, when he was a child, and other children today have the right to not be harmed or sexually molested by agents and former agents of Defendant Holy See.

278.    Defendant Holy See owes a duty to warn all children and their parents that come into contact with its agents or former agents of allegations of sexual misconduct by the agents and former agents because these children and their parents hold many of these agents and former agents in esteemed positions, believe in the infallibility of the Supreme Pontiff, and the trustworthiness of Defendant Holy See, all of which gives them virtually unlimited access to children.

279.    Defendant Holy See also owes a duty to children and their parents to release all of the names of and documents regarding its agents and former agents against whom Defendant Holy See has deemed to have credible allegations of sexual misconduct with children to law enforcement and to the public at large.

280.    Unless injunctive relief is granted, numerous children worldwide, across the United States and in New York are at risk of being sexually molested by Defendant Holy See's agents and former agents.  In order to ensure that children are protected and free from sexual molestation by Defendant Holy See's agents and former agents, Plaintiff is entitled to and requests an injunction ordering that Defendant Holy See:

     a.    Release the names of the perpetrators involved in the more than 3,400 credible cases in Defendant Holy See's possession to the public and to law enforcement;

     b.    Release the names of Defendant Holy See's agents and former agents that it found guilty of sexual misconduct with children to the public and to law enforcement;

     c.    Require the Bishops of each diocese to release the names of all agents and former agents who have been credibly accused of sexual misconduct with children;

     d.    Release the names of Defendant Holy See's agents or former agents that

have admitted abusing children to the public and to law enforcement; and

    e.    Release the names of Defendant Holy See's agents and former agents that have been convicted of sexually abusing a child to law enforcement and to the public.

## EIGHTH CAUSE OF ACTION
## INJUNCTION FOR RELEASE OF DOCUMENTS REGARDING SEX OFFENDERS

281.    Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

282.    Defendant Holy See's practices have endangered numerous children in the past and these practices will continue to put children at risk in the future.

283.    Plaintiff, when he was a child, and other children today have the right to not be harmed or sexually molested by agents and former agents of Defendant Holy See.

284.    Defendant Holy See's practices of retaining, hiding, and concealing evidence of crimes of its agents and former agents has endangered numerous children and continues to put children in peril.

285.    Defendant Holy See owes a duty to all children and their parents to release all documents relating to agents and former agents accused of sexually molesting children and also to release.

286.    Unless injunctive relief is granted, numerous children across the United States, including in New York, and across the world are at risk of being sexually molested by Defendant Holy See's agents and former agents.  In order to ensure that children are protected and free from sexual molestation by Defendant Holy See's agents and former agents, Plaintiff is entitled to and request an injunction ordering that Defendant Holy See:

    a.    Release all documents on the 3,400 credible cases in Defendant Holy See's possession to the public and to law enforcement

b.      Release all documents related to Defendant Holy See's agents and former agents that it found guilty of sexual misconduct with children to the public and to law enforcement;

c.      Release all documents related to Defendant Holy See's agents or former agents that have admitted abusing children to the public and to law enforcement;

d.      Require the bishops of each diocese to release the documents related to agents and former agents who have been credibly accused of sexual misconduct with children; and

e.      Release all documents related to Defendant Holy See's agents and former agents that have been convicted of sexually abusing a child to law enforcement and to the public.

## NINTH CAUSE OF ACTION
## ADDITIONAL INJUNCTIVE RELIEF

287.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth under this count.

288.    As a result of the violations under the common law of the states, the federal common law, the laws of the 50 states and customary international law of human rights set forth herein, and in addition to monetary damages for those violations, Plaintiff seeks orders:

a.      Requiring that Defendant Holy See cease its violations of the internationally recognized human rights of children;

b.      Requiring Defendant Holy See to report all allegations of child sexual abuse in each and every one of the United States;

c.      Requiring that Defendant Holy See conform its conduct to the mandates of the common law of the states, the federal common law, the laws of the 50 states, and

customary international law of human rights;

     d.     Requiring that Defendant Holy See act in ways that are in the best interests of children; and

     e.     Retaining jurisdiction in this Court for a period of no less than ten (10) years to ensure that the interests of children are not further compromised by the conduct of Defendant Holy See.

## TENTH CAUSE OF ACTION
## NEGLIGENCE

289.    Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

290.    Defendant Holy See, by and through its agents, servants and employees, breached duties owed to the Plaintiff under the common law of the states, the federal common law, the laws of the 50 states, the law of the State of New York and customary international law of human rights including, but not limited to:

     a.     The duty to provide reasonable care, custody and control of the minor children entrusted by their parents to the Roman Catholic churches under the absolute control of Defendant Holy See.

     b.     The duty to warn parents who entrusted their children's care, custody and control to the churches of the Roman Catholic Church that priests and other clerics were known pedophiles, sexual predators and perpetrators of child sexual abuse.

     c.     The duty to warn parents and children of a dangerous condition on Defendant's premises.

     d.     The duty to provide reasonable supervision of its employees to prevent sexual abuse.

e.     The duty to not retain employees that presented an unreasonable risk of harming others.

f.     The duty to report known or suspected perpetrators of child sexual abuse to authorities as required by statutory law, common law, and customary international law.

291.    The Defendant knew that its priests, clerics and agents in the United States, including New York, were committing acts of child sexual abuse and engaging in dangerous and exploitive conduct as pedophiles, sexual predators and perpetrators of child sexual abuse, and that these priests, clerics, bishops, archbishops, cardinals, agents, and employees created an unsafe condition on the premises of the aforesaid churches and schools, institutions to whom the custody and control of said minor children was placed.

292.    The acts and omissions of Defendant Holy See, alleged herein, including the concealment of its policy of harboring and protecting its abusive priests, agents and employees from public disclosure and prosecution and directives prohibiting the reporting of child sexual abuse to authorities, as part of a regular course of commercial conduct and particular commercial transactions and acts, was a substantial factor in bringing about the damages suffered by the Plaintiff described herein as a result of child sexual abuse.

## ELEVENTH CAUSE OF ACTION
## NEGLIGENT TRAINING AND SUPERVISION

293.    Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

294.    At all times material, McCarrick was employed by Defendant and was under Defendant's direct supervision, employ, and control when he committed the wrongful acts alleged herein.  McCarrick engaged in the wrongful conduct while acting in the course and scope of his employment with Defendant and/or accomplished the sexual abuse by virtue of his job-created

authority.

295.    Defendant had a duty, arising from its employment of McCarrick, to ensure that McCarrick did not sexually molest children.

296.    Further, Defendant had a duty to train and educate employees and administrators and establish adequate and effective policies and procedures calculated to detect, prevent, and address inappropriate behavior and conduct between clerics and children.

297.    Defendant was negligent in the training, supervision, and instruction of its employees.  Defendant failed to timely and properly educate, train, supervise, and/or monitor its agents or employees with regard to policies and procedures that should be followed when sexual abuse of a child is suspected or observed.

298.    Defendant was additionally negligent in failing to supervise, monitor, chaperone, and/or investigate McCarrick and/or in failing to create, institute, and/or enforce rules, policies, procedures, and/or regulations to prevent McCarrick's sexual abuse of Plaintiff.

299.    In failing to properly supervise McCarrick, and in failing to establish such training procedures for employees and administrators, Defendant failed to exercise the care that a reasonably prudent person would have exercised under similar circumstances.

300.    As a direct result of the foregoing, Plaintiff sustained physical, emotional, and psychological injuries, along with pain and suffering.

## TWELTH CAUSE OF ACTION
## NEGLIGENT RETENTION

301.    Plaintiff incorporates all consistent paragraphs of this Complaint as if fully set forth under this count.

302.    Defendant became aware or should have become aware of McCarrick's propensity for child sexual abuse, and failed to take any further action to remedy the problem and failed to

investigate or remove McCarrick from working with children.

303.    Defendant negligently and/or recklessly retained McCarrick with knowledge of McCarrick's propensity for the type of behavior which resulted in Plaintiff's injuries in this action.

304.    Defendant negligently and/or recklessly retained McCarrick in a position where he had access to children and could foreseeably cause harm which Plaintiff would not have been subjected to had Defendant acted reasonably.

305.    In failing to timely remove McCarrick from working with children or terminate the employment of McCarrick, Defendant negligently and/or recklessly failed to exercise the degree of care that a reasonably prudent person would have exercised under similar circumstances.

306.    As a direct result of the foregoing, Plaintiff sustained physical, emotional, and psychological injuries, along with pain and suffering.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff demands judgment against Defendant Holy See in an amount in excess of $75,000.00, plus costs, disbursements, reasonable attorneys' fees, interest, and such other relief that the Court deems just and equitable, including the injunctive relief sought above.

**DEMAND IS HEREBY MADE FOR A TRIAL BY JURY.**

Dated:  December 8, 2019
          New York, New York                    JEFF ANDERSON & ASSOCIATES, P.A.


                                         *s/Nahid A. Shaikh*
                                         Nahid A. Shaikh, #5327747
                                         52 Duane Street, 7th Floor
                                         New York, NY 10007
                                         Telephone: (646) 759-2551
                                         Email: nahid@andersonadvocates.com

                                         Attorney for Plaintiff